**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A22-0965**
**A22-1613**
**A22-1746**

Partners in Nutrition d/b/a Partners in Quality Care Appeal of MDE Decision Child and Adult Care Food Program December 2021 Claims for Reimbursement (A22-0965),

and

In re the Matter of:
Partners in Nutrition d/b/a Partners in Quality Care's Consolidated Appeals of MDE's May 27, 2022 Decision Terminating Agreement and Withholding Federal Award Payments, and the Related June 17, 2022 Site Applications Denial Decision, Child and Adult Care Food Program (A22-1613),

and

Re: Partners in Nutrition d/b/a Partners in Quality Care's Appeals of MDE-NPS's July 25, 2022 Decision Denying Claims for Reimbursement for November and December 2021 (on Remand) and January through May 2022, Child and Adult Care Food Program (A22-1746).

**Filed September 18, 2023**
**Affirmed in part and reversed in part**
**Gaïtas, Judge**

Minnesota Department of Education

Kevin D. Conneely, Emily M. Asp, Stinson LLP, Minneapolis, Minnesota; and

Mark E. Weinhardt (pro hac vice), The Weinhardt Law Firm, Des Moines, Iowa (for relator Partners in Nutrition)

Keith Ellison, Attorney General, Joseph Weiner, Kathleen Li Reitz, Martha J. Casserly, Assistant Attorneys General, St. Paul, Minnesota (for respondent Minnesota Department of Education)

Considered and decided by Slieter, Presiding Judge; Frisch, Judge; and Gaïtas, Judge.

**SYLLABUS**

The Minnesota Department of Education may not rely on 2 Code of Federal Regulations sections 200.339-.340 (2023) to terminate an institution's participation in the Children and Adult Care Food Program without complying with the program-specific procedural requirements of 7 Code of Federal Regulations section 226.6(c)(3) (2023).

**OPINION**

**GAÏTAS**, Judge

In these consolidated certiorari appeals, relator Partners in Nutrition d/b/a Partners in Quality Care (Partners) challenges four decisions by respondent Minnesota Department of Education (MDE) related to Partners's participation in the Children and Adult Care Food Program (food program). Three of the decisions denied Partners's claims for reimbursement under the food program, and one of the decisions terminated Partners's food-program agreement. We conclude that MDE's termination decision was based on legal error because MDE proceeded under general regulations governing federal awards to nonfederal entities and did not comply with the specific regulations governing food-program termination. We therefore reverse MDE's decision terminating Partners's food-program agreement. But we are not persuaded by Partners's arguments that MDE's claim-denial decisions are based on legal error, in violation of regulatory or constitutional notice requirements, unsupported by substantial evidence, or arbitrary or capricious. We therefore affirm those decisions.

2

## FACTS

MDE administers the state's participation in the Children and Adult Care Food Program, a federal program overseen by the U.S. Department of Agriculture (USDA) that is "intended to provide aid to child and adult participants and family or group day care homes for provision of nutritious foods that contribute to the wellness, healthy growth, and development of young children, and the health and wellness of older adults and chronically impaired persons." 7 C.F.R. § 226.1 (2023). "Federal funds are disbursed to state agencies that are charged with accepting applications for participation and making reimbursement to approved institutions, which may be the facilities providing care or sponsoring organizations that provide meals or facilitate reimbursement to facilities." *Partners in Nutrition's Appeal of Disapproval of Site Expansion in CACFP Program*, 904 N.W.2d 223, 228 (Minn. App. 2017) (*PIN*), *rev. denied* (Minn. Oct. 17, 2017).

Partners participated in the food program as a sponsoring organization until MDE terminated its food-program agreement in May 2022. As a sponsoring organization, Partners was responsible for overseeing sites under its sponsorship and seeking reimbursement from food-program funds. *See* 7 C.F.R. §§ 226.2 (defining "sponsoring organization"), .16 (detailing sponsoring organization provisions) (2023). Partners's participation in the food program was governed by both the federal regulations, 7 C.F.R. §§ 226.1-.27 (2023) (the food-program regulations), and its food-program agreement with MDE. Under both the regulations and the agreement, Partners accepted "final administrative and financial responsibility" for sites under its sponsorship. 7 C.F.R. § 226.16(c); *see* 7 C.F.R. § 226.6(b)(4)(ii) (2023).

3

The events underlying these appeals occurred against the backdrop of MDE's concerns that a different sponsoring organization was fraudulently obtaining food-program funds during the COVID-19 pandemic. Those concerns led to a federal investigation and, ultimately, indictments and plea agreements. The federal investigation is described in search-warrant and arrest affidavits that were made public during 2022. Notwithstanding connections between the targets of the federal investigation and Partners, Partners denies any knowing involvement in the alleged fraudulent scheme.[1]

### Serious Deficiency Notice, Suspension, and Proposed Termination

On March 31, 2021, MDE issued a serious deficiency notice to Partners.[2] The notice identified serious deficiencies related to three food-program performance

---

[1] Partners filed a motion to strike MDE's addendum in A22-0965, arguing that it improperly included documents related to the federal investigation that were not part of the administrative record. We denied the motion to strike because MDE had requested the court to take judicial notice of developments in the federal fraud investigation. We take judicial notice of the fact that the federal investigation has resulted in numerous indictments and guilty pleas, but we conclude that the factual allegations in the federal indictments are not the appropriate subject of judicial notice. *See* Minn. R. Evid. 201(b) (allowing court to take judicial notice of a fact that is "not subject to reasonable dispute"); *see also In re Denial of Contested Case Hearing Requests*, 993 N.W.2d 627, 657 n.11 (Minn. 2023) (taking judicial notice of public records to illuminate the issues presented but not as evidence of the substance of statements in those records).

[2] As we discuss further in section I of the analysis, the food-program regulations include procedures for ensuring compliance that begin with a state agency determining that an institution is "seriously deficient" and may culminate in termination of an institution's food-program agreement. *See* 7 C.F.R. § 226.6(c)(3). Partners, as a sponsoring organization, is considered to be an "institution" under the food program. *See* 7 C.F.R. § 226.2 (defining "[i]nstitution" as "a sponsoring organization, child care center, at-risk afterschool care center, outside-school-hours care center, emergency shelter or adult day care center which enters into an agreement with the State agency to assume final administrative and financial responsibility for Program operations").

standards—financial viability and management, administrative capability, and program accountability—and dictated required corrective actions. MDE required Partners to provide documentation of completion of the required corrective action by April 30, 2021, and notified Partners that if the serious deficiencies were not fully and permanently corrected, MDE would propose to terminate Partners's food-program agreement and disqualify Partners, its executive director, Kara Lomen, and its board president, Jim Handrigan, from future participation in the food program.

On June 16, 2021, MDE notified Partners of its determination that Partners had "fully and permanently corrected the serious deficiencies that were cited in the Serious Deficiency Notice," and that "the serious deficiency determination ha[d] been temporarily deferred." MDE noted, however, that "if, in any subsequent review, any of these serious deficiencies have not been fully and permanently corrected, [MDE] will immediately propose to terminate [Partners's] agreement and propose to disqualify [Lomen and Handrigan] without any further opportunity for corrective action."

Seven months later, on January 20, 2022, MDE notified Partners that it was "suspending payment of claim reimbursement for [Partners] as of January 20, 2022." The letter explained:

> This action is being taken in response to the federal investigation of organizations participating in the USDA Child Nutrition programs for mail fraud, wire fraud, conspiracy and money laundering. This investigation was made public through the unsealing of warrants and affidavits on January 20, 2022 by the United States District Court for the District of Minnesota. The warrants and affidavits document [food-program] site operators and organizations connected to the investigation. A number of those named are connected to sites

5

sponsored by [Partners]. Therefore, MDE is suspending all payments to [Partners].

MDE relied on language in the food-program regulations providing that "if . . . a State agency has reason to believe that an institution . . . has engaged in unlawful acts with respect to Program operations, the evidence . . . is a basis for nonpayment of claims for reimbursement." 7 C.F.R. § 226.10(f). On January 31, 2022, MDE—relying on the food-program regulations—proposed to terminate Partners's food-program agreement and disqualify Partners, Lomen, Handrigan, and others.

On February 2, 2022, MDE provided to Partners a document titled "Meal Claim Instructions during Suspension Period." That document communicated that MDE would require Partners to submit the following documents to support claims for reimbursement: "meal and snack count records"; "attendance records"; "menus for all meals and snacks served"; "receipts and invoices for meals purchased"; and, for at-risk afterschool programs, "documentation of educational and enrichment activities offered to children." Although the "Meal Claim Instructions" linked the documentation request to provisions in the food-program regulations that prohibit payment of claims to a suspended institution, it also stated that MDE was requiring additional documentation "[b]ecause [Partners] was found to have submitted false and fraudulent claims."

Partners appealed the January suspension and the proposed termination and disqualification action to an MDE administrative appeal panel, which consolidated the

matters, held a hearing, and issued a decision on May 17, 2022.[3] The MDE appeal panel reversed and remanded for further proceedings. With respect to the suspension, the MDE appeal panel concluded that MDE did not comply with the procedural requirements for suspending Partners under the food-program regulations. With respect to the termination and disqualification, the MDE appeal panel determined that the proposed termination and disqualification was based on different deficiencies than those identified in the March 31, 2021 serious deficiency notice and that MDE had not properly notified Partners of the serious deficiencies that were the basis for the proposed termination and disqualification. The MDE appeal panel described the termination and disqualification decision as "procedurally premature and improper." It remanded for "[MDE] to re-assess the matter and carry out [its] duties in a manner consistent with the applicable federal regulations and procedural rules."

***Claim-Denial Decisions—March and April 2022***

During the pendency of Partners's appeal of the January suspension and proposed termination, MDE issued three letters in March and April 2022 denying claims for reimbursement submitted by Partners for November and December 2021. MDE denied each of the claims for one of five reasons: (1) "invoice and/or menu do not support the claim"; (2) "delivering groceries (ingredients) not meals"; (3) "missing some documents";

---

[3] The food-program regulations require state agencies to "develop procedures for offering administrative reviews" for certain actions, including proposed termination of a food-program agreement, suspension of an institution's participation in the food program, and claim denials. 7 C.F.R. § 226.6(k)(1), (2) (2023).

(4) "no documents uploaded to support claim"; and (5) "facts of the affidavit do not support claim."[4]

Partners appealed the March and April claim-denial actions to the MDE appeal panel, which held hearings and issued decisions on June 7 and July 5, 2022. In each decision, the MDE appeal panel separately addressed each of the five reasons for the claim denials. The panel affirmed the denial of claims on the bases that invoices and/or menus did not support the claims, that groceries rather than meals were delivered, and that no documents had been uploaded to support the claims. Due to a lack of sufficient notice, the MDE appeal panel vacated and remanded the denial of claims on the other bases—that some documents were missing and that the facts of the affidavit did not support the claims.

***Termination of Food-Program Agreement***

Meanwhile, on May 27, 2022, MDE had notified Partners that it was terminating Partners's food-program agreement, denying all pending site applications, and withholding all payments. MDE explained:

> These actions are being taken in response to the federal investigation into a fraud scheme to misappropriate millions of dollars in federal child nutrition program funds. This investigation was made public through the unsealing of search warrants and affidavits on January 20, 2022 through the United States District Court for the District of Minnesota. On April 21, 2022 and May 20, 2022 additional affidavits were filed in support of arrests of two individuals, . . . both of whom are targets of the federal investigation. Evidence can be found in each of these five (5) unsealed affidavits which tie

---

[4] Although not expressly stated in MDE's letters denying the November and December 2021 claims, we understand the fifth reason to reference the federal affidavits submitted in support of search warrants in relation to the federal investigation into food-program fraud.

[Partners's] operation to the fraud being investigated by the Federal Bureau of Investigation . . . .

Rather than relying on the food-program regulations that had been the basis for its previous actions against Partners, MDE relied on federal regulations adopted by the Office of Management and Budget (OMB) to govern federal awards. *See* 2 C.F.R. §§ 200.0-.521 (2023) (the OMB regulations). MDE stated that the actions were

> being taken with the authority under 2 CFR 200:
> - 2 CFR 200.339 Remedies for noncompliance
>   - 2 CFR 200.339(e) Withhold further Federal awards for the project or program.
> - 2 CFR 200.340 Termination
>   - 2 CFR 200.340(a)(1) By the Federal awarding agency or pass-through entity, if a non-Federal entity fails to comply with the terms and conditions of a Federal award.

On June 17, 2022, MDE issued another letter confirming the denial of 213 pending applications for new meal-service sites.

Partners took an administrative appeal from the termination and related actions to the MDE appeal panel, which held a hearing and issued a decision on October 14, 2022. The MDE appeal panel affirmed in all respects. It reasoned that the OMB regulations apply to the food program and allowed MDE to withhold payments and terminate Partners's food-program agreement without complying with the procedural requirements of the food-program regulations. And the MDE appeal panel concluded that the site applications were appropriately denied based on the termination of the food-program agreement.

*Claim-Denial Decision—July 2022*

While the administrative appeal was pending on its termination action, MDE notified Partners on July 25, 2022, that it was denying claims for reimbursement for

9

January through May 2022. MDE also provided additional explanation and denied November and December 2021 claims that had been remanded by the MDE appeal panel. MDE based the denials on the termination of Partners's food-program agreement. But MDE also reviewed documents that Partners had provided to validate the claims and denied the January through May 2022 claims for the same five reasons it had denied the November and December 2021 claims. Partners again appealed to the MDE appeal panel, which held a hearing and issued a decision on November 15, 2022. The MDE appeal panel affirmed all of the claim denials.

Partners filed three separate certiorari appeals, challenging the MDE appeal panel's (1) June 7 and July 5, 2022 decisions, which affirmed MDE's March and April 2022 claim-denial decisions (A22-0965); (2) October 14, 2022 decision, which affirmed MDE's termination of Partners's food-program agreement (A22-1613); and (3) November 15, 2022 decision, which affirmed MDE's July 2022 claim-denial decision (A22-1746). At the parties' request, we consolidated the three appeals following briefing.

## ISSUES

I.      Is MDE's decision to terminate Partners's food-program agreement based on legal error?

II.     Are MDE's claim-denial decisions based on legal error, in violation of constitutional provisions, unsupported by substantial evidence, or arbitrary and capricious?

## ANALYSIS

In reviewing administrative decisions, an appellate court must "adhere to the fundamental concept that decisions of administrative agencies enjoy a presumption of

10

correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn. 2001). In this certiorari appeal from MDE's decisions, we "examine the record to review questions affecting the jurisdiction of the agency, the regularity of its proceedings, and, as to the merits of the controversy, whether the [decisions were] arbitrary, oppressive, unreasonable, fraudulent, under an erroneous theory of law, or without any evidence to support [them]." *PIN*, 904 N.W.2d at 228 (quotation omitted).[5]

Partners separately challenges MDE's claim-denial and termination decisions. We first address the termination decision.

---

[5] In *PIN*, we applied the common-law certiorari standard to an MDE food-program decision on an issue for which the relator had waived an available hearing before the MDE appeal panel. 904 N.W.2d at 228. In this case, the MDE appeal panel held hearings that were required to be offered under the food-program regulations and there is a question about whether the appeals are thus governed by the provisions of the Minnesota Administrative Procedure Act (MAPA), Minnesota Statutes sections 14.001 to .69 (2022), addressing review of decisions following a contested case. *See* Minn. Stat. §§ 14.02, subd. 3 (defining "contested case"), .63 (providing for judicial review of a decision in a contested case), .69 (providing a standard of review). But Partners timely perfected its certiorari appeals whether they are governed by MAPA or the statute governing common-law petitions for writs of certiorari. *Compare* Minn. Stat. § 14.63 (requiring filing and service of a petition within 30 days of receipt of an agency's final decision and order), *with* Minn. Stat. § 606.01 (2022) (requiring filing and service of an issued writ within 60 days of due notice of decision). And the MAPA "scope of review is similar to the common law scope of review on certiorari. Thus, the same standard applies regardless of the applicability of [MAPA]." *Staeheli v. City of St. Paul*, 732 N.W.2d 298, 304 n.1 (Minn. App. 2007). We accordingly need not resolve whether these appeals are governed by MAPA or the common-law standard.

11

**I.** **MDE erred by terminating Partners's food-program agreement without complying with the procedural requirements of the food-program regulations.**

Partners argues that MDE lacked legal authority to terminate Partners's food-program agreement under the OMB regulations without complying with the procedural requirements of the food-program regulations. MDE asserts that it had authority to proceed under the OMB regulations alone. This dispute requires us to review MDE's interpretation and application of federal regulations—an issue of law subject to de novo review. *In re Reichmann Land & Cattle, LLP*, 867 N.W.2d 502, 506 (Minn. 2015). We will defer to MDE's interpretation only if it is a reasonable interpretation of ambiguous regulations; in the absence of ambiguity in the regulations, we will apply their plain meaning. *Id.* Neither Partners nor MDE argue that the pertinent provisions of the food-program and OMB regulations are ambiguous, and we conclude that they are not.

We begin our analysis with the National School Lunch Act, 42 U.S.C. § 1766 (2018) (the act), which created the food program and required the secretary of the USDA to "establish procedures for the termination of participation by institutions . . . under the program." 42 U.S.C. § 1766(d)(5)(A). The act provides that a state agency shall require corrective action by an institution but allows the state agency to require immediate suspension of operations where there is an "imminent threat to public health or safety." *Id.* (d)(5)(C). And the act requires that a hearing be provided before participation is terminated but allows participation to be suspended without a hearing subject to independent review on written documentation—if the state agency determines that an institution has "knowingly submitted a false or fraudulent claim for reimbursement." *Id.* (d)(5)(D).

12

Under the food-program regulations, which were adopted by the secretary as required by the act, a state agency like MDE must initiate termination proceedings if it "determines that a participating institution has committed one or more [listed] serious deficienc[ies]." 7 C.F.R. § 226.6(c)(3)(i).[6] The list of serious deficiencies in the regulations is extensive and includes:

> (C) Failure to operate the Program in conformance with the [applicable] performance standards . . . ;
>
> . . . .
>
> (F) Failure to maintain adequate records;
>
> . . . .
>
> (H) Claiming reimbursement for meals not served to participants;
>
> (I) Claiming reimbursement for a significant number of meals that do not meet Program requirements;
>
> . . . .
>
> (O) Failure by a sponsoring organization to properly train or monitor sponsored facilities . . . ; [and]
>
> . . . .
>
> (U) Any other action affecting the institution's ability to administer the Program in accordance with Program requirements.

*Id.* (c)(3)(ii). "[I]f the serious deficiency is the submission of a false or fraudulent claim, . . . the State agency may suspend the institution's participation in accordance with [7 C.F.R. § 226.6](c)(5)(ii)," which requires that the state agency give notice of a proposed suspension and allow review by a suspension review official. *Id.* (c)(3)(iii). But, consistent

---

[6] Upon determining that an institution committed serious deficiencies, the state agency also must initiate action to disqualify the institution and any responsible principals and individuals from further participation in the food program. 7 C.F.R. § 226.6(c)(3)(i). The same procedural process applies to both termination and disqualification. *See* 7 C.F.R. § 226.6(c)(3). For ease of reference, and because MDE did not take action to disqualify Partners in the decisions at issue in these appeals, we limit our discussion here to termination.

with the act, the food-program regulations only permit immediate suspension of participation if there is a threat to public health or safety. *Id.* (c)(5)(i)(A) (2023).

The food-program regulations provide a multi-step procedure for termination, beginning with the state agency issuing a serious deficiency notice that provides the institution with an opportunity to take corrective action. *Id.* (c)(3)(iii)(A).[7] If the institution timely completes the corrective action, the state agency must notify the institution that it has "temporarily defer[red] its serious deficiency determination." *Id.* (c)(3)(iii)(B)(1)(i). But if the corrective action is not completed, or if the serious deficiencies later recur, the state agency must propose to terminate the institution's agreement. *Id.* (c)(3)(iii)(B)(3), (C). After the time to administratively appeal the proposed termination expires or after an administrative review official upholds the proposed termination, the state agency must notify the institution that its agreement has been terminated. *Id.* (c)(3)(iii)(E).

The language of the food-program regulations makes clear that they provide the exclusive procedure to suspend or terminate an institution's participation in the program. Under 7 Code of Federal Regulations section 226.6(c)(5) (2023), "[a] State agency is

_____

[7] The corrective-action requirement includes no exceptions, and thus must be understood to apply even in cases where an institution has submitted false or fraudulent claims. *See also* 7 C.F.R. § 226.6(c)(4)(ii) (providing that a state agency may allow no more than 30 days for corrective action "[i]f the State agency determines that an institution has engaged in unlawful practices, submitted false or fraudulent claims or other information to the State agency, or been convicted of or concealed a criminal background"). Although we can conceive of policy reasons for foregoing the corrective-action requirements in certain circumstances, we must apply the federal regulations as they are written.

prohibited from suspending an institution's participation (including all Program payments) except" as provided in the food-program regulations. And under section 226.6(c)(3)(iii):

> If the State agency determines that a participating institution has committed one or more serious deficiency listed . . . , the State agency must use the following procedures to provide the institution and the responsible principals and responsible individuals notice of the serious deficienc[ies] and an opportunity to take corrective action.

The USDA explains that "[t]he serious deficiency process offers a systematic way for State agencies to take actions allowing institutions to correct serious Program problems and ensures due process." U.S. Dep't of Agric., *Serious Deficiency, Suspension, & Appeals for State Agencies and Sponsoring Organizations*, *A Child & Adult Care Food Program Handbook* at 10 (February 2015).

Here, the MDE appeal panel acknowledged the required application of the food-program regulations in its May 17, 2022 decision reversing MDE's January 2022 termination and disqualification actions. But the MDE appeal panel later concluded, in its October 14, 2022 termination decision that is appealed here, that MDE could terminate Partners's food-program agreement under the OMB regulations without complying with the food-program regulations.[8] MDE maintains that position on appeal. We thus turn our

---

[8] The MDE appeal panel did not explain in its October 14, 2022 termination decision why it elected not to follow its May 17, 2022 decision, which determined that the food-program regulations apply to termination decisions.

attention to the OMB regulations and how they apply in relation to the food-program regulations.[9]

The OMB regulations "establish[] uniform administrative requirements, cost principles, and audit requirements for Federal awards to non-Federal entities." 2 C.F.R. § 200.100(a)(1). The regulations preclude federal awarding agencies from "impos[ing] additional or inconsistent requirements . . . unless specifically required by Federal statute, regulations, or Executive order." *Id.* But the OMB regulations also provide that "in any circumstances where the provisions of Federal statutes or regulations differ from the provisions of this part, the provision of the Federal statutes or regulations govern." 2 C.F.R. § 200.101(d). And they provide that a state agency terminating an award must "comply with any requirements for hearings, appeals, or other administrative proceedings to which the non-federal entity is entitled under any statute or regulation applicable to the action involved." 2 C.F.R. § 200.342.

In terminating Partners's food-program agreement, MDE relied on two provisions of the OMB regulations that provide general authority for the suspension and termination of federal awards. The first, 2 Code of Federal Regulations section 200.339(e), allows a state agency administering federal funds to "[w]ithhold further Federal awards for the project or program" if it determines that the award recipient has failed to comply with the

---

[9] We agree with MDE that the OMB regulations, with the exception of parts of subpart C, generally apply to the food program. *See* 2 C.F.R. §§ 200.1 (defining "federal award"), .101(b)(2) (addressing broad applicability of the OMB regulations to federal awards), (f)(4)(v) (exempting the food program from part of subpart C). The issue here is how the OMB regulations apply in relation to the food-program regulations.

law or the terms and conditions of the award and "that noncompliance cannot be remedied by imposing additional conditions." The second, 2 Code of Federal Regulations section 200.340(a)(1), allows a federal award to be terminated if the recipient "fails to comply with the terms and conditions of [the award]."

MDE argues that it can terminate a food-program agreement solely under the OMB regulations, without complying with the procedural requirements of the food-program regulations, because the two sets of regulations do not "differ" within the meaning of 2 C.F.R. § 200.101(d).[10] More specifically, MDE argues that the food-program regulations address circumstances when a state agency *must* seek termination and disqualification, and the OMB regulations provide a state agency *with discretion* to terminate a federal award. We are not persuaded by MDE's argument because we conclude that the regulations differ in both the substantive standards governing termination and the procedural requisites.

As MDE acknowledges in its brief, MDE is required by the food-program regulations to initiate termination and disqualification proceedings when it finds serious deficiencies. The list of serious deficiencies is comprehensive, encompassing all conduct "affecting the institution's ability to administer the [food program] in accordance with Program requirements." 7 C.F.R. § 226.6(c)(3)(ii)(U). But under the food-program regulations, the state agency cannot immediately terminate (or propose to terminate) an institution's food-program agreement. *See* 7 C.F.R. § 226.6(c)(3). It must first comply

---

[10] MDE does not address the application of 2 Code of Federal Regulations section 200.342, which requires compliance with the procedural requirements of program-specific regulations.

17

with the procedural requirements of the food-program regulations by noticing the serious deficiencies and allowing corrective action. *See id.* And the food-program regulations permit suspension (i.e., withholding) of reimbursements (i.e., payments) only in limited circumstances subject to additional procedural requirements. *Id.* (c)(3)(iii).

In contrast, the OMB regulations allow withholding of payments upon determination that noncompliance with a federal program cannot be remedied through further conditions and allow termination of a federal award based on noncompliance. *See* 2 C.F.R. §§ 200.339(a), (c), .340(a)(1). Procedurally, the OMB regulations merely require notice and an opportunity to object before termination of a federal award. *See* 2 C.F.R. §§ 200.341-.342.

Because the food-program regulations differ from the OMB regulations in relation to termination of program participation, MDE was required to comply with the food-program regulations. *See* 2 C.F.R. §§ 200.101(d), .342. Thus, MDE's termination decision was based on legal error and must be reversed. Borrowing a phrase from the MDE appeal panel's May 17, 2022 decision, we conclude that MDE's termination decision was "procedurally premature and improper." Nothing in our decision, however, should be read to preclude MDE from proceeding under the food-program regulations, on an appropriate record, to terminate Partners's food-program agreement.[11]

---

[11] As part of reversing the termination decision, we reverse MDE's denial of 213 site applications. The record reflects that the site applications were made for the 2022 program year, which began October 2022. Partners requests that we remand the matter to MDE but does not state whether it intends to pursue approval of the site applications for the 2022 program year. Under its food-program agreement, Partners is required to annually submit information necessary for program approval, including applications for participation or

**II.     Partners has not established a basis for reversing MDE's claim-denial decisions.**

Partners challenges MDE's March, April, and July 2022 decisions denying Partners's claims for reimbursement.  It argues that the claim-denial decisions must be reversed on four grounds, which we address below.

**A.     MDE did not err by requiring Partners to document its claims.**

Partners first asserts that MDE's claim denials are based on legal error because they are "predicated" on MDE's January 20, 2022 suspension action that the MDE appeal panel reversed in its May 17, 2022 decision.  More specifically, Partners asserts that, absent the later-reversed suspension, it would have had "no affirmative obligation to submit documentation for each of its claims for MDE to approve those claims for reimbursement." Absent such an obligation, Partners asserts, MDE's denial of claims based on lack of documentation was legally erroneous.  We reject this argument because it is based on the flawed premise that MDE lacked authority—absent a suspension—to require a sponsoring organization to submit documentation before approving claims.

As a sponsoring organization, Partners was required to collect and maintain, for at least three years, records including the precise categories of documents that MDE required

_____

renewal of each site.  We thus do not discern a basis to remand the matter.  However, nothing in our decision should preclude Partners from seeking approval, or MDE from taking appropriate action, on the 2022 site applications.

We also conclude that MDE lacked legal authority to "withhold" payments from Partners under the OMB regulations without complying with the procedural requirements of the food-program regulations.  But this error does not provide a basis for reversal because MDE provided alternative support for its claim-denial decisions, which we affirm in section II below.

19

it to submit beginning in February 2022. *See* 7 C.F.R. §§ 226.10(d), .15(e). In submitting a claim, Partners "certif[ied] that the claim [was] correct and that records [were] available to support that claim." 7 C.F.R. § 226.10(c). And Partners was required to make all records related to the food-program available to MDE "upon request . . . for audit or review, at a reasonable time and place." *Id.* (d). Partners does not dispute that its food-program participation was subject to these requirements. Instead, it argues that, because the food-program regulations do not require contemporaneous submission of documents before a claim can be approved, MDE lacked authority to impose such a requirement on Partners. We disagree.

As a state agency administering the food program, MDE is responsible for establishing "procedures for institutions to properly submit claims for reimbursement." 7 C.F.R. § 226.7(k) (2023). "Claims for reimbursement shall report information in accordance with the financial management system established by the State agency, and in sufficient detail to justify the reimbursement claimed . . . ." 7 C.F.R. § 226.10(c). "If, based on the results of audits, investigations, or other reviews, a State agency has reason to believe that an institution . . . has engaged in unlawful acts with respect to Program operations, the evidence found in audits, investigations, or other reviews is a basis for non-payment of claims for reimbursement." *Id.* (f).

Given MDE's broad authority—indeed, responsibility—to ensure the integrity of the food program in Minnesota, we conclude that it had authority to require Partners to contemporaneously submit documentation for claims following its discovery of Partners's connections to the federal investigation into food-program fraud. And we conclude that

20

MDE had such authority regardless of whether it also suspended Partners's participation in the food program. Partners argues that MDE cannot rely on its authority to request records under 7 Code of Federal Regulations section 226.10 because MDE identified suspension-related provisions in the meal-claim instructions document. But MDE also stated that it was requiring contemporaneous submission of documents because Partners "was found to have submitted false and fraudulent claims."

Partners relatedly seems to suggest that, once the suspension was reversed, MDE could no longer consider deficiencies in documents that Partners had submitted pursuant to MDE's requirements in the "Meal Claim Instructions" document. It cites no authority to support such an exclusionary rule, nor are we aware of any. And the federal regulations make clear that evidence obtained from "audits, investigations, or other reviews" may provide the basis for denial of a claim. 7 C.F.R. § 226.10(f).

**B.      Partners received sufficient notice of the reasons for claim denials.**

Partners next asserts that MDE failed to give adequate reasons for the "vast majority of" claim denials in violation of the food-program regulations and constitutional due-process requirements. Specifically, Partners asserts that two of MDE's reasons—that the invoice and/or menu did not support the claim and that groceries rather than meals were delivered—were fatally vague.

We addressed similar arguments in *In re New Am. Dev. Ctr. Appeal*, No. A22-1506, 2023 WL 4553423, at *7-9 (Minn. App. July 17, 2023) (*New American*). In *New American*, the relator challenged the adequacy of the claim-denial reason: "supporting documentation not being consistent with the claims submitted." 2023 WL 4553423, at *7.

21

We recognized the requirement of the food-program regulations that notice be given of the basis for an adverse action. *Id.* (citing 7 C.F.R. § 226.6(k)(5)(i) (2023)). And we recognized the due-process right in administrative proceedings to "notice of the claims of the opposing party and an opportunity to meet them." *Id.* at *8 (quoting *Anderson v. Moberg Rodlund Sheet Metal Co.*, 316 N.W.2d 286, 288 (Minn. 1982)). We noted that the MDE appeal panel had determined that MDE "sufficiently informed relator of the reasons for denial and recovery because the inconsistencies were 'blatant and ubiquitous'" and that both MDE and the MDE appeal panel had identified examples of "red flags" and "irregularities." *Id.*

Although we "[did] not laud the notice given by MDE[,]" we concluded that "relator ha[d] not established that it received insufficient notice under [food-program] regulations or due process." *Id.* We explained that the relator cited no authority supporting its assertion that the notice was insufficient under the food-program regulations and that "the notice required by due process varies with the circumstances of each case." *Id.* (quotation omitted). And we reasoned that MDE's notice was sufficient because relator was expected to be a sophisticated entity familiar with the food-program regulations, and because MDE had identified in its notice the most relevant food-program rules. *Id.* at *8-9. We stated:

> The . . . regulations—together with the expectation that relator be sophisticated in following them—minimized the specificity needed to put relator on reasonable notice of the basis for MDE's denial-and-recovery decision. Relator was required to have a recordkeeping process by which it thoroughly reviewed and certified the accuracy of each monthly reimbursement claim based on the relevant records before submitting the claim. Relator was expected to know that failing to adequately

22

keep these records would be grounds to deny and recover reimbursement for the relevant period.

*Id.* at \*9.

Our analysis in *New American* is apt and persuasive, and we apply the same analysis here. *See* Minn. R. Civ. App. P. 136.01, subd. 1(c) (nonprecedential opinions may be cited as persuasive authority). As in *New American*, the MDE appeal panel here determined that MDE's notices were sufficient to apprise Partners, a sophisticated entity charged with complying with the food-program regulations, of the reasons for MDE's claim-denial decisions. We agree. *See In re Emmanuel Nursing Home*, 411 N.W.2d 511, 516-17 (Minn. App. 1987) (explaining that determining sufficiency of notice must take into account all of the circumstances and reasoning that notice was sufficient in that case "because nursing homes which participate in the Medical Assistance program are subject to a host of detailed rules which they are expected to know in order to be entitled to Medical Assistance reimbursement"), *rev. denied* (Minn. Oct. 13, 1987).

According to Partners, the reason "[i]nvoice and/or menu do not support the claim" was a "vague rejection [that] provides absolutely no insight into the reason for the denial; and it fails to enable [Partners] to submit additional documentation to support the claim or to argue its case on appeal." Partners points to claims for which it submitted invoices and menus. It posits that, because it submitted those documents, "it must be that MDE has determined that . . . there was *something wrong or deficient* about them," and it laments that "MDE's Claim Denial Letters gave no clue what that error or deficiency is." However, through this reasoning, Partners demonstrates that it received sufficient notice. Partners is

23

charged with knowing what the food-program regulations require to support a claim for reimbursement. And Partners understood that MDE determined there was "*something wrong or deficient*" with the invoices and/or menus submitted to support a claim. Accordingly, we reject Partners's argument that the reason "[i]nvoice and/or menu do not support the claim" did not provide adequate notice of MDE's reason for denying claims.

Partners also challenges the sufficiency of the reason "[d]elivering groceries (ingredients) not meals." Again, however, Partners's argument demonstrates its understanding of the reason for MDE's denial on this ground. "[Partners] does not dispute the general proposition that the sites under its sponsorship are to deliver meals to the populations eligible to receive [food-program]-supported food and not simply deliver ingredients used for the preparation of meals." But Partners asserts that, because of certain waivers during the COVID-19 pandemic (that did not include waiver of the unitized meal requirement), MDE's reason "[did] not pass due process muster." Partners identifies a claim in which a site purchased "apples, graham crackers, milk, and bananas" and asks, "In what rational school-food-program world are those reasonably deemed 'ingredients' or 'groceries' and not part of a meal?" This substantive argument about the basis for a particular claim denial demonstrates that Partners understood the basis for the denial but disagreed with it. Accordingly, we reject Partners's argument that the reason "delivering groceries (ingredients) not meals" did not provide adequate notice of MDE's reason for denying claims.

24

**C.** **Partners has not demonstrated that MDE's claim-denial decisions are unsupported by substantial evidence.**

Partners next argues that MDE's claim-denial decisions are not supported by substantial evidence. The substantial-evidence test has two parts: a reviewing court must determine (1) "whether the agency has adequately explained how it derived its conclusion" and (2) that conclusion must be "reasonable on the basis of the record." *In re RS Eden/Eden House*, 928 N.W.2d 326, 333 (Minn. 2019) (quotation omitted). "Substantial evidence requires more than a scintilla of evidence, more than some evidence, and more than any evidence." *Id.* (quotation omitted). "The [relator] bears the burden of establishing that the agency findings are not supported by the evidence in the record." *Id.* (quotation omitted). We discern and address four substantial-evidence arguments.

### 1. *Invoices and/or menus do not support claims*

Partners first challenges the evidentiary basis for MDE's denial of claims on the basis that the invoices and/or menus did not support the claims, arguing that it submitted invoices and menus "for the vast majority of the claims that MDE denied on this ground." As Partners surmises in its notice argument, however, MDE's reason for denying these claims was not that these documents were not submitted, but rather than there was "*something wrong or deficient* about them." Partners offers only a conclusory assertion that MDE's actual reason for denying the claims was unsupported by substantial evidence, arguing that that the appeal panel's decisions "reflect, as did MDE's original denials, no evidentiary showing on the issue."

25

MDE's decision to deny claims on this ground is supported by the exhibits MDE submitted to the MDE appeal panel, which consist of the documents Partners submitted to MDE in relation to each of the claims. MDE has explained—including through the use of examples before the appeal panel and this court—the reasons for its claim-denial decisions on this ground. We conclude that MDE's explanation is reasonable on the basis of the record. In contrast to MDE's examples-driven explanation, Partners has failed to explain how its documentation was sufficient to support even a single claim. Importantly, it was Partners's responsibility to gather and maintain—and make available to MDE upon request—documents supporting its food-program claims. *See* 7 C.F.R. §§ 226.10(d), .16(e) ("Each sponsoring organization shall comply with the recordkeeping requirements established in [7 C.F.R. § 226.16(d)] . . . ."). And it is Partners's burden on appeal to show that MDE's decisions lack the support of substantial evidence. *RS Eden*, 928 N.W.2d at 333. It has not met this burden.

### 2. *Groceries rather than meals delivered*

Partners next challenges the evidentiary basis for MDE's denial of claims on the basis that groceries, rather than meals, were delivered, asserting that it submitted menus demonstrating that meals were served. And Partners asserts that "MDE appears to demand evidence that goes beyond" the documents that the "Meal Claim Instructions" required it to submit. But again, Partners had the burden to provide documentation sufficient to support its claims. Partners received notice before the MDE appeal-panel hearing that MDE considered the documentation that Partners had provided insufficient to show that meals were delivered, and Partners had an opportunity to present additional evidence to the

MDE appeal panel to support its claims. *See* 7 C.F.R. § 226.6(k)(5)(v) (2023) (allowing an institution to refute a claim denial through "written documentation" submitted "not later than 30 days after receipt of the notice of action"). However, Partners failed to do so, and we conclude that, on the record before it, MDE reasonably denied claims that included receipts for raw ingredients. Accordingly, we conclude that Partners has not met its burden to demonstrate that MDE's claims denials on this ground are unsupported by substantial evidence.

### 3. Denial of entire claims

Partners's third argument is that MDE's claim-denial decisions are "overbroad" because MDE only may deny the "portion of a claim for reimbursement that does not meet federal requirements." In support of this argument, Partners relies on 7 Code of Federal Regulations 226.14(a), which provides:

> State agencies shall disallow any portion of a claim for reimbursement and recover any payment to an institution not properly payable under this part. State agencies may consider claims for reimbursement not properly payable if an institution does not comply with the recordkeeping requirements contained in this part.

MDE responds that "[it] never found that just *parts* of [Partners's] claims lacked documentary support. Rather, [it] found [Partners's] recordkeeping failures so ubiquitous and systemic that it was unfeasible to verify any portion of a claim based on the submitted paperwork independently of the remainder of the claim."

We reject Partners's overbreadth argument for the same reasons we have rejected its other substantial-evidence arguments: because it fails to identify any particular

"portions" of claims that it asserts should have been allowed based on the documents that it submitted. MDE has explained the basis for its decision to deny claims in their entirety—because of pervasive recordkeeping failures that prevented MDE from validating any portion of the claims—and that explanation is reasonable on the basis of the record. Accordingly, we again conclude that Partners has not met its burden to demonstrate that MDE's claim-denial decisions are unsupported by substantial evidence.

### 4. *No supporting documents*

Partners finally challenges MDE's July 2022 denial of claims between January and May 2022 on the basis that no supporting documents were submitted. It asserts that "[t]he reason no documents had been uploaded yet is that [Partners], in the ordinary course of its business, had not yet submitted the claims." Partners did submit documents to the MDE appeal panel to support these claims. The MDE appeal panel found [Partners's] "delay [in providing the documents] unreasonable and its provided reason unconvincing." But the MDE appeal panel nevertheless considered the documents and "concluded they continue to fall short of requirements under the federal regulations." The MDE appeal panel provided an example of the recordkeeping deficiencies, and MDE provides another example on appeal. And, yet again, Partners fails to explain how the documents it submitted are sufficient to support a single claim, or portion thereof. Accordingly, we again conclude that Partners has not met its burden to demonstrate that MDE's claim-denial decisions are unsupported by substantial evidence.

**D.     MDE did not err by relying on affidavits from the federal investigation.**

Partners last asserts that the MDE appeal panel erred in relying on documents from the federal investigation and suggests that the MDE appeal panel's decision is therefore arbitrary and capricious because the MDE appeal panel considered factors not intended to be considered.  But the food-program regulations specifically provide that "evidence found in audits, investigations, or other reviews" may provide a "basis for non-payment of claims for reimbursement" if it gives a state agency "reason to believe that an institution . . . has engaged in unlawful acts with respect to Program operations."  7 C.F.R. § 226.10(f).  And Partners cites no authority that would constrain MDE from considering the federal-investigative documents, which included sworn affidavits from federal law enforcement connecting Partners to individuals alleged to have diverted food-program funds for their personal use.  Accordingly, we reject Partners's argument for reversal on this ground.

## DECISION

MDE erred by relying on the OMB regulations, 2 C.F.R. §§ 200.339-.340, to terminate Partners's participation in the food program without complying with the program-specific procedural requirements of 7 Code of Federal Regulations section 226.6(c)(3).  But Partners has not demonstrated that MDE's decisions denying Partners's claims for reimbursement are based on legal error, in violation of regulatory or constitutional provisions, unsupported by substantial evidence, or arbitrary or capricious. We therefore affirm the claim-denial decisions and reverse the termination decision.

**Affirmed in part and reversed in part.**

29